UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

FREDDRICK MACMILLAN,

                        Plaintiff,

          - against -

MILLENIUM BROADWAY HOTEL,

                        Defendant.

**MEMORANDUM
OPINION & ORDER**

09 Civ. 6053 (PGG)

PAUL G. GARDEPHE, U.S.D.J.:

              In this action, Plaintiff Freddrick McMillan alleges that Defendant Millennium

Broadway Hotel subjected him to a hostile work environment based on his race in violation of

Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e et seq., 42 U.S.C. §

1981, and the New York City Human Rights Law (the "NYCHRL"), N.Y.C. Admin. Code § 8-

107 et seq.  Following a four-day trial, a jury returned a verdict in Plaintiff's favor, awarding him

$125,000 in compensatory damages for emotional distress and $1 million in punitive damages.

              Defendant has moved under Fed. R. Civ. P. 50 for judgment as a matter of law,

and under Fed. R. Civ. P. 59 for a new trial and/or a remittitur concerning the damage awards.

For the reasons stated below, Defendant's motion for judgment as a matter of law will be denied.

Defendant's motion for a new trial will be granted with respect to the compensatory and punitive

damage awards unless Plaintiff accepts a remittitur reducing the amount of compensatory

damages to $30,000 and the amount of punitive damages to $100,000.

## BACKGROUND

### I.   THE EVIDENCE AT TRIAL

McMillan has worked at the Millennium Broadway Hotel (the "Hotel") for more than twenty years.[1] (Tr. 175)  After fourteen years in the Hotel's Housekeeping Department, McMillan transferred to the Engineering Department in 2003.  After his transfer, McMillan was initially supervised by Ray Cypress and Christina Canette.  (Tr. 176-79)  McMillan did not suffer any discrimination under their supervision.  (Tr. 179)

According to McMillan, his working conditions changed in 2004 when Tom Scudero became the Hotel's Director of Property Operations.  Scudero supervised the Engineering Department and relegated McMillan to undesirable tasks, such as dealing with complaints – "house calls" – from Hotel guests.  McMillan considered this assignment undesirable because it required less skill than other jobs.  (Tr. 184)  McMillan's requests for other assignments were denied.  (Tr. 185)  McMillan also testified that he was disciplined for minor mistakes, and felt that he had to "go back to calls four [or] five times to make sure that nothing was done wrong, because anything that [his supervisors] would find . . . they would write me up for."  (Tr. 197)  On one occasion, McMillan was disciplined for a white employee's mistake.  (Tr. 199)  McMillan testified that Scudero did not treat white employees in the same demeaning manner.  (Tr. 201-02)

McMillan testified that it was "horrible" working under Scudero, and complained that Scudero "allow[ed] an atmosphere where you're called the 'N' word all the time" by co-workers.  (Tr. 185-86)  McMillan cited an April 18, 2007 incident, in which co-worker Cromwell

---

[1]  McMillan has remained employed at the Hotel throughout this litigation.  (Tr. 202-03)

Bodden[2] said "What's up N***A" to McMillan and others in the Engineering Office.[3]  (Tr. 187;

Dx K)  McMillan also testified that on May 24, 2007, another Hotel employee, Jarek Zgoda,

referred to McMillan as "boy,"[4] and that on another occasion in 2007, Bodden used the phrase

"us Negroes" in McMillan's presence.[5]  (Tr. 191)[6]

Two incidents at the Hotel were the focus of Plaintiff's liability case at trial:  (1)

the display of a black voodoo doll in January 2008; and (2) the use of a racial epithet by one of

McMillan's co-workers in June 2009.

### A.      The January 2008 Voodoo Doll Incident

In January 2008, Scudero traveled to New Orleans on vacation.  (Tr. 270)  While

there, he purchased six voodoo dolls as souvenirs for his management team.  (Tr. 270-71)

Scudero testified that he thought the dolls "would be a cute . . . souvenir.  Thought, you know,

typical New Orleans.  We had seen them all around as we were traveling and I figured I could

kind of personalize them just so I could basically give them a gift."  (Tr. 271-72)

---

[2] There was conflicting testimony concerning Bodden's race.  McMillan testified that Bodden is Hispanic and is from Honduras.  (Tr. 208)  Chief Engineer Joe Fariello testified that Bodden is African-American.  (Tr. 309)  Bodden appears to self-identify as black, as McMillan testified that he used the phrase "us Negroes."  (Tr. 191)
[3] Bodden received an oral warning as a result of this incident.  (Dx K)
[4] Zgoda claimed that McMillan had referred to him as "sonny."  (Tr. 212-13)
[5] Bodden was placed on written warning as a result of this incident.  (Dx O)
[6] As discussed below, the jury was instructed that these 2007 incidents could be considered only as background evidence, and could not be the basis for a liability finding.  (Tr. 466-67)  With respect to the Zgoda incident, McMillan and the Hotel had entered into a settlement agreement in 2007 in which McMillan granted the Hotel a full release.  See MacMillan v. Millennium Broadway Hotel, No. 09-cv-6053(PGG), 2011 WL 4357523, at *1 (S.D.N.Y. Sept. 16, 2011). With respect to the April 18, 2007 Bodden incident, McMillan filed a complaint with the New York State Division of Human Rights, which dismissed the complaint, issuing a finding of no probable cause.  Id.

On January 23, 2008, Scudero brought the voodoo dolls to work and laid them out on his desk so that he could decorate them for each recipient.[7] (Tr. 272-73) McMillan entered Scudero's office that morning and noticed the voodoo dolls on Scudero's desk. (Tr. 191-92, 273) McMillan said to Scudero, "Tom, shouldn't I be offended by those dolls?" Scudero answered no, explaining that he had bought the dolls as gifts for his managers.[8] (Tr. 192) McMillan then said, "Tom, those dolls better not be about me." (Tr. 192) Scudero replied that the dolls "were not about you," and repeated that he had bought the dolls for his managers. (Id.) McMillan testified that he nonetheless believed that the dolls were "about black people." (Tr. 221)

Scudero subsequently distributed the dolls to his management team. Chief Engineer Joe Fariello was not in the office at that time, however, so Scudero pinned Fariello's doll to a bulletin board above Fariello's desk in the Engineering Department. (Tr. 278, 254-55)

Three days after McMillan saw the dolls in Scudero's office, he noticed the doll hanging from the bulletin board above Fariello's desk. (Tr. 193) McMillan regularly entered the Engineering Department office in which Fariello sat: he borrowed tools that were kept behind Fariello's desk, he frequently asked Fariello – the Chief Engineer – whether he needed assistance; and he entered the office to pick up his paycheck. (Tr. 183) McMillan testified that "[t]he [voodoo] doll was hanging to the side [of the bulletin board] with a noose around its neck." (Tr. 193; Def. Ex. LL) The doll had a black face and pink lips. (Tr. 51; Dx LL)

---

[7] Scudero "customized" each doll, attaching something of significance to the recipient. For example, Scudero tied a disposable razor to a doll given to a manager who commonly came to work unshaven, and he attached images of dollar signs and coins to a doll given to a manager responsible for energy conservation and cost savings. (Tr. 275-78)
[8] Scudero denied that McMillan asked whether he should be offended by the dolls, claiming that McMillan simply asked what the dolls were "all about." (Tr. 252-53, 273)

4

McMillan was "very upset" about the display (Tr. 194) and complained to Vincent Foster, his union delegate.  (Tr. 152-53)

Other Hotel employees were likewise offended by the display of the doll.  (Tr. 160, 50)  Foster testified that he was "disgusted" by the doll.  (Tr. 160)  Hotel employee Colin Taylor testified that the manner in which the doll was displayed evoked a lynching.  (Tr. 172)

On January 28, 2008, Nowratan Paray, a supervisor in the Engineering Department (Tr. 55), told McMillan that the doll represented him.  (Tr. 74-78, 101-04, 144, 156, 245-46)  McMillan was offended by Paray's comment.  (Tr. 75, 96)

On January 30, 2008, Eddie Cedeno, another union official, complained to Kathleen Pyne, then the Hotel's Director of Human Resources, about the voodoo doll display.  (Tr. 49-50)  The doll had been hanging on Fariello's bulletin board since January 24, 2008.  (Px 23)  Pyne accompanied Cedeno to the Engineering Department.  (Tr. 49)  After Pyne saw the doll on the bulletin board, either she or Cedeno immediately took it down.  (Tr. 134-35)

Pyne testified that the display of the doll on the bulletin board created "chaos" at the Hotel, and ultimately led the union to call a "work stoppage."  Many employees – mostly minority employees – congregated in the Hotel lobby.  (Tr. 50-52)  Concerned about Scudero and Fariello's safety, Pyne asked them to leave the building.  (Tr. 51-52)  Pyne then addressed the assembled employees and promised them that she would conduct an investigation and take corrective action if appropriate.  (Tr. 52-53)

Pyne commenced her investigation immediately, and she interviewed 33 employees over the next two weeks.  (Tr. 87; Px 23)  She began her investigation by speaking with Scudero and Fariello, and then interviewed recipients of the dolls as well as Hotel employees who had seen or might have seen the doll pinned to Fariello's bulletin board.  (Tr. 87)

Pyne took notes at each interview, and then prepared a written memorandum for each interview. (Tr. 56; Px 23)  Pyne concluded that some employees were offended by the voodoo doll display, while others were not.  (Tr. 55, 133)  All of the employees who were offended were minorities. (Tr. 55)

The Hotel took several steps as a result of this incident.  The General Manager issued a letter of apology to all employees and stated that harassment of any sort would not be tolerated at the hotel.  (Dx CC; Tr. 133)  When Scudero – who was on paid leave while the investigation was pending – returned to work, he gave a public apology to the Hotel's employees.  The Hotel also offered "dignity-at-work" training after this incident.  (Tr. 81-82, 133, 260)

No one was disciplined or terminated as a result of the voodoo doll incident, however.  (Tr. 81-82, 132-33, 260)  Scudero returned to his position as Director of Property Operations, and he testified that "no one from the hotel" ever told him that he had done anything wrong in displaying the voodoo doll.  (Tr. 81, 260)

B. **The June 2009 Luis Sierra Incident**

On June 22, 2009, while sitting at a desk in the Engineering Department office, McMillan overheard Hotel co-worker Luis Sierra repeatedly use the word "nigger" in the hallway outside.  (Tr. 196, 390; Dx Q)  Sierra then entered the Engineering Department office, and he continued to say "N this and N that."  (Tr. 390)  McMillan told Sierra, "give me a break," and Sierra patted him on the shoulder and said, "Ok man, Ok."  (Tr. 196)  McMillan was "very upset" about the incident and immediately reported it to the Human Resources Department.  (Tr. 196, 386)  Robert Lafferty, who was then Director of Human Resources, conducted an investigation.  (Tr. 386; Dx Q)

Lafferty asked McMillan to prepare a written statement.  (Tr. 389-91)  Because McMillan had identified Izlau Chin, an Engineering Department employee, as a witness to Sierra's conduct, Lafferty "immediately" contacted her.  (Tr. 391, 401)  Chin told Lafferty that although she did not hear Sierra use the word "nigger," she overheard McMillan say, "I would appreciate it if you didn't use that word."  McMillan then entered Chin's office and said, "sometimes I really hate working here."  (Tr. 392; Dx Q)  Lafferty asked Chin to prepare a written statement.  (Tr. 392)

The following day, Chin provided a written statement to Lafferty.  (Dx Q; Tr. 393)  Chin's written statement did not include McMillan's alleged remark to Sierra that he "would appreciate it if you didn't use that word."  (Dx Q; Tr. 393)  Lafferty noted the omission and asked Chin to explain.  (Dx Q; Tr. 393)  Chin responded that she was not certain that McMillan had made that statement and, accordingly, she had omitted it from her written account. (Dx Q; Tr. 394)

Because McMillan had told Lafferty that Sierra's misconduct had taken place at about 3:45 during a shift change – when employees were punching in and out – Lafferty obtained time cards in an attempt to identify possible witnesses.  (Tr. 387-88)  Lafferty then interviewed all employees who punched in or out around the time of the alleged incident.  (Dx Q; Tr. 387, 395)  Lafferty interviewed nine employees in total, and took contemporaneous notes during the interviews.  (Tr. 387, 395; Dx Q)  None of the employees corroborated McMillan's allegations. (Tr. 396; Dx Q)  Lafferty also interviewed Sierra, who denied using the word "nigger" on June 22, 2009, or on any other occasion at the Hotel.  (Dx Q)  At the end of his investigation, Lafferty prepared a report concluding that McMillan's allegation was not corroborated.  Lafferty shared a one-page summary of his report with McMillan and advised him that his allegation had not been

7

corroborated.  (Tr. 387, 396; Dx Q)  Lafferty told McMillan that if he wished to submit any additional evidence, Lafferty would be happy to consider it.  (Tr. 397)

        **C.**    **McMillan's Damages Evidence**

Because McMillan remained employed in the Hotel's Engineering Department throughout the pendency of this litigation, he asserted no claim for economic damages.  Instead, he sought damages for alleged emotional distress and punitive damages.

McMillan's evidence concerning emotional distress was quite limited.  He testified that he found working in the Engineering Department "horrible," but otherwise did not testify about any emotional distress he suffered.  (Tr. 185)  When asked by his counsel how Scudero's conduct "made you feel," McMillan merely said that "[i]t made me feel like Tom was being racist against me for no particular reason."  (Tr. 201)

McMillan's daughter testified that her father "was always sad" when he was working under Scudero, and that he felt that no one believed his complaints of discrimination or listened to him.  (Tr. 301)  She explained that after Scudero became his supervisor, McMillan "changed his temperament," "wasn't as happy anymore," and "wasn't his same self."  (Tr. 301-02)  McMillan told his daughter on several occasions that he would prefer to work in the Housekeeping Department.  (Tr. 302)  Foster testified that "it was hard" for McMillan to work in the Engineering Department and that he had "watched [McMillan] constantly going through all the stress."  (Tr. 154, 156)  McMillan told Foster that the voodoo doll incident was "very detrimental to me."  (Tr. 156)

*     *     *     *

The jury found that McMillan proved all elements of his racial harassment hostile work environment claims under Title VII, Section 1981, and the NYCHRL, and that the Hotel

had not proven its affirmative defense to McMillan's claims.  The jury awarded McMillan

$125,000 in compensatory damages for emotional distress and $1 million in punitive damages.

(Tr. 516)

## DISCUSSION

## I.      DEFENDANT IS NOT ENTITLED TO JUDGMENT AS A MATTER OF LAW

### A.      Standard of Review

The Hotel seeks judgment as a matter of law with respect to McMillan's hostile

work environment claim.  (Def. Br. 3-16)  The standard for granting judgment as a matter of law

under Fed. R. Civ. P. 50 is "well established":

> Judgment as a matter of law may not properly be granted under Rule 50 unless the
> evidence, viewed in the light most favorable to the opposing party, is insufficient to
> permit a reasonable juror to find in her favor.  In deciding such a motion, the court must
> give deference to all credibility determinations and reasonable inferences of the jury, and
> it may not itself weigh the credibility of witnesses or consider the weight of the evidence.
> Thus, judgment as a matter of law should not be granted unless
>
> (1) there is such a complete absence of evidence supporting the verdict that the jury's
>      findings could only have been the result of sheer surmise and conjecture, or
>
> (2) there is such an overwhelming amount of evidence in favor of the movant that
>      reasonable and fair minded [persons] could not arrive at a verdict against [it].

Galdieri-Ambrosini v. Nat'l Realty & Dev. Corp., 136 F.3d 276, 288 (2d Cir. 1998) (internal

citations omitted); see also Brady v. Wal-Mart Stores, Inc., 531 F.3d 127, 133-34 (2d Cir. 2008)

(same).  The Second Circuit has noted that a party moving for judgment as a matter of law "faces

a high bar."  Lavin-McEleney v. Marist Coll., 239 F.3d 476, 479 (2d Cir. 2001).

### B.      Analysis

To prevail on a hostile work environment claim under Title VII and Section 1981,

a plaintiff must demonstrate that (1) he was a member of a protected class; (2) he was subjected

to harassment, either through words or actions, based on his membership in that protected class;

(3) the harassment was sufficiently severe or pervasive to alter the conditions of employment and create an abusive work environment; and (4) there is a specific basis for imputing the conduct creating a hostile work environment to the employer.  See Alfano v. Costello, 294 F.3d 365, 374 (2d Cir. 2002); Payne v. Malemathew, No. 09-CV-1634(CS), 2011 WL 3043920, at *3 (S.D.N.Y. July 22, 2011); Early v. Wyeth Pharm., Inc., 603 F. Supp. 2d 556, 578 (S.D.N.Y. 2009).  The jury was so instructed (Tr. 473-74), and the Hotel has not challenged the Court's charge.

> To prevail on a hostile work environment claim under the NYCHRL, a plaintiff must demonstrate that (1) he was a member of a protected class; (2) he was subjected to harassment, either through words or actions, based on his membership in that protected class; (3) he was treated less well than other employees because of his membership in that protected class; and (4) there is a specific basis for imputing the conduct creating a hostile work environment to the employer.  See Zhao v. Time Inc., No. 08 Civ. 8872(PAC), 2010 WL 3377498, at *22 (S.D.N.Y. Aug. 24, 2010); Zambrano-Lamhaouhi v. New York City Bd. of Educ., No. 08-CV-3140(NGG)(RER), 2011 WL 5856409, at *9 (E.D.N.Y. Nov. 21, 2011) (quoting Williams v. New York City Hous. Auth., 61 A.D.3d 62, 73-78 (1st Dept. 2009)); Kaur v. New York City Health and Hospitals Corp., 688 F. Supp.2d 317, 339-40 (S.D.N.Y. 2010); Zakrzewska v. The New School, 14 N.Y.3d 469, 477 (2010); see also Fleming v. MaxMARA USA, Inc., 644 F. Supp. 2d 247, 268 (E.D.N.Y. 2009).  The jury was instructed in accordance with this standard (Tr. 479), and the Hotel has not challenged the Court's instructions.

> The Hotel argues that it is entitled to judgment as a matter of law because (1) there is no evidence that McMillan experienced anything more than sporadic and isolated incidents of alleged harassment; (2) there is no evidence that McMillan was subjected to

discrimination because of his race; (3) the Hotel proved its affirmative defense under federal law by demonstrating that it had an anti-harassment policy in place and that it took prompt action in response to discrimination allegations; and (4) the Hotel proved its affirmative defense under the NYCHRL by demonstrating that the alleged conduct constituted nothing more than isolated petty slights and trivial inconveniences.  The Court concludes that there is sufficient evidence to support the jury's findings on each of these issues.

With respect to the Hotel's first argument – that McMillan suffered no more than sporadic and isolated incidents of harassment – there was sufficient evidence to support the jury's determination that McMillan was subjected to harassment that was sufficiently severe or pervasive to alter the conditions of his employment and create an abusive work environment. The Court gave the following instruction to the jury concerning this element:

> . . . Mr. McMillan must prove by a preponderance of the evidence that the harassment unreasonably interfered with his work performance and created an intimidating, hostile, or offensive work environment.  Workplace conduct is not measured in isolation in this regard.  Rather, Mr. McMillan must demonstrate either that a single incident was extraordinarily severe or that a series of incidents were sufficiently continuous and concerted to have altered the conditions of his working environment.  Mr. McMillan must show that his workplace was permeated with discriminatory intimidation, ridicule, and insult that was sufficiently severe or pervasive to alter the conditions of his employment and create an abusive working environment.

> In determining whether Mr. McMillan has satisfied this element, you should look to all the circumstances, including the frequency of the alleged discriminatory conduct, its severity, whether it was physically threatening or humiliating, or a mere offensive utterance, and whether the discriminatory conduct unreasonably interfered with Mr. McMillan's performance of his work.  Generally, incidents must be more than episodic:  they must be sufficiently continuous and concerted in order to be deemed pervasive.  However, a single incident of harassment may give rise to a hostile work environment claim if it is very serious – that is, if, by itself, it can and does work a transformation of the plaintiff's workplace.

> Mr. McMillan need not show psychological injury, but he must show that he perceived the environment to be abusive and that a reasonable person would find the working environment to be hostile or abusive.  In other words, Mr. McMillan

11

must meet both an objective and subjective test. The conduct must be severe or pervasive enough to create an objectively hostile or abusive work environment, and Mr. McMillan must also have subjectively perceived the environment to be abusive.

(Tr. 474-76)

"[I]n all cases, juries are presumed to follow the court's instructions." CSX Transp., Inc. v. Hensley, 556 U.S. 838, 841 (2009) (citing Greer v. Miller, 483 U.S. 756, 766 n.8 (1987)). Here, the jury was entitled to find that the display of the voodoo doll – which deeply offended McMillan and many of his co-workers, some of whom found the display evocative of lynchings of black men – was serious enough to work a transformation of McMillan's workplace. The jury was likewise entitled to find that the voodoo doll display – a black-faced doll hung by what some employees took to be a noose – was exceedingly severe and sufficient, in and of itself, to create a hostile work environment.[9]

The Hotel next argues that there was no evidence that McMillan was subjected to harassment because of his race. On this element, the jury was instructed that, to prevail on his Title VII and Section 1981 claims, "Mr. McMillan must prove that he was the subject of harassment and that this harassment was based on his race. . . . The harassment must . . . have been motivated by the plaintiff's race. This means that Mr. McMillan must prove beyond a

---

[9]  The Hotel argues that the jury must have ignored the Court's limiting instruction that the 2007 incidents could be considered only as background evidence. (Def. Br. 12-13) The Court instructed the jury as follows: "These incidents were admitted as background evidence and are to be considered by you only on the issue of whether the Hotel acted with discriminatory intent with respect to Mr. McMillan. These two incidents cannot serve as a basis for a liability finding against the Hotel under either Mr. McMillan's federal or New York City Human Rights Law claims, however, or as the basis for an award of damages. The events surrounding the 2008 and 2009 incidents are the focus of Mr. McMillan's claims." (Tr. 466-67) "[T]he law recognizes a strong presumption that juries follow limiting instructions," United States v. Snype, 441 F.3d 119, 129 (2d Cir. 2006) (citations omitted), and there is no reason to believe that the jury ignored this instruction. As discussed above, the voodoo doll incident, standing alone, was sufficiently severe to alter the terms of McMillan's employment.

preponderance of the evidence that the conduct occurred <u>because of his race</u>."  (Tr. 474) (emphasis added)  With respect to McMillan's NYCHRL claim, the Court instructed the jury that McMillan had to prove that he "was subject to harassment, either through words or actions, <u>based on his membership in [a] protected class</u>."[10]  (Tr. 479) (emphasis added)

To a great extent, the outcome of the trial turned on the jury's conclusions regarding Scudero's intent in pinning the voodoo doll to the bulletin board.  The issue of intent in a discrimination case presents a classic jury question.  <u>See</u> <u>Pemrick v. Stracher</u>, 67 F. Supp. 2d 149, 168 (E.D.N.Y. 1999) ("the issue of intent usually is a jury question"); <u>see</u> <u>also</u> <u>Papalia v. Milrose Consultants, Inc.</u>, No. 09 Civ. 9257(NRB), 2011 WL 6937601, at *7 (S.D.N.Y. Dec. 29, 2011) ("The Second Circuit has 'repeatedly emphasized "the need for caution about granting summary judgment to an employer in a discrimination case where . . . the merits turn on a dispute as to the employer's intent."'") (quoting <u>Gorzynski v. JetBlue Airways Corp.</u>, 596 F.3d 93, 101 (2d Cir. 2010) (quoting <u>Holcomb v. Iona Coll.</u>, 521 F.3d 130, 137 (2d Cir. 2008))).

In displaying a black-faced voodoo doll on an Engineering Department bulletin board – hanging by a string wrapped around the doll's neck – Scudero chose to exhibit what McMillan and other minority employees regarded as an extremely inflammatory racial symbol. Although Scudero offered an explanation for the display that was not race-based (Tr. 271-72), the jury was free to reject that explanation.  <u>Zellner v. Summerlin</u>, 494 F.3d 344, 371 (2d Cir.

---

[10]  In response to a jury note during deliberations, the Court reinforced its earlier instructions concerning McMillan's burden to demonstrate this causal connection.  The jury asked:  "If the intent of an act is not racially motivated but the act itself is racially offensive, does that constitute racial harassment?"  (Tr. 512)  The Court reiterated that "the plaintiff must demonstrate that the conduct at issue here including, for example, Mr. Scudero's pinning of the doll onto the bulletin board, occurred <u>because of Mr. McMillan's race.</u>  There must be a causal connection.  Mr. McMillan must demonstrate that he was subjected to a hostile work environment <u>because of his race.</u>"  (Tr. 513) (emphasis added)  "[A] jury is presumed to understand a judge's answer to its question."  <u>Weeks v. Angelone</u>, 528 U.S. 225, 234 (2000) (citation omitted).

2007) (in ruling on a motion for judgment as a matter of law, "the court must bear in mind that the jury is free to believe part and disbelieve part of any witness's testimony").  Moreover, the jury was entitled to consider McMillan's testimony that he had indicated to Scudero that he was offended by the voodoo dolls, but that Scudero nonetheless decided to hang one of the dolls on an Engineering Department bulletin board.  The jury was also entitled to consider Paray's statement to McMillan that the doll represented McMillan.

   In determining whether the Hotel had acted with discriminatory intent, the jury was also permitted to consider the repeated use of derogatory racial remarks by McMillan's co-workers in the Engineering Department, as well as the adequacy of the Hotel's response to those incidents.  (Tr. 466-67)  See Shub v. Westchester Cnty. Coll., 556 F. Supp. 2d 227, 242 (S.D.N.Y. 2008) (permitting plaintiff to introduce as background evidence events that were the subject of a general release, noting that "[a]lthough plaintiff relies on events prior to 1999 to establish a background for defendants' retaliatory intentions and conduct, the general release does not prohibit him from doing such"); Jute v. Hamilton Sundstrand Corp., 420 F.3d 166, 176 (2d Cir. 2005) ("evidence of an earlier alleged retaliatory act may constitute relevant 'background evidence in support of [a] timely claim'") (quoting National R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 113 (2002)).

   In sum, the Hotel has not demonstrated either that there is a "complete absence of evidence supporting the verdict" or that "there is such an overwhelming amount of evidence in [its] favor . . . that reasonable and fair minded [persons] could not arrive at a verdict against [it]." Fed. R. Civ. P. 50.

   The Hotel also argues that the jury was required to accept its affirmative defenses. (Def. Br. 13)  The Court instructed the jury that under Title VII and Section 1981 the Hotel made

out an affirmative defense if it proved by a preponderance of the evidence that "(1) it exercised reasonable care to prevent and promptly correct any racial harassment by its supervisors or employees; and (2) Mr. McMillan unreasonably failed to avail himself of any corrective or preventative opportunities provided by the hotel, or to avoid harm otherwise." (Tr. 477; see Petrosino v. Bell Atlantic, 385 F.3d 210, 225 (2d Cir. 2004))  As to McMillan's NYCHRL claim, the jury was instructed that the Hotel made out an affirmative defense if it "prove[d] by a preponderance of the evidence that the racial harassment experienced by Mr. McMillan constituted nothing more than what a reasonable victim of discrimination would consider petty slights and trivial inconveniences." (Tr. 482; see Williams, 61 A.D.3d at 79-80)

Although there was evidence that the Hotel's Human Resources Department conducted lengthy investigations of the voodoo doll incident and the Sierra incident (Tr. 86-131; Dx VV; Tr. 386-99; Dx Q, R), no employee was terminated or sanctioned in any fashion for either incident. (Tr. 81-82, 132)  Indeed, Pyne testified – as to the voodoo doll incident – that the Hotel never concluded that "anyone had done something wrong." (Tr. 132)  The jury could have found that the Hotel's response to McMillan's complaints of racial harassment was not appropriate or adequate under the circumstances.  Moreover, as to McMillan's NYCHRL claim, the jury could have concluded that the display of the voodoo doll was not a "petty slight or trivial inconvenience."  In sum, this Court cannot find that the Hotel made out its affirmative defenses as a matter of law.

The Hotel's motion for judgment as a matter of law will be denied.

## II.   REMITTITUR OF THE COMPENSATORY AND PUNITIVE DAMAGE AWARDS

### A.   Standard of Review

"When a trial court finds a damage verdict to be excessive, it may order a new trial on all issues or only on the question of damages.  Alternatively, the court may grant remittitur. . . ."  Iannone v. Frederic R. Harris, Inc., 941 F. Supp. 403, 411 (S.D.N.Y. 1996) (citations omitted).

"'Remittitur is the process by which a court compels a plaintiff to choose between a reduction of an excessive verdict and a new trial.'"  Chisholm v. Memorial Sloan-Kettering Cancer Center, No. 09 Civ. 8211(VM), 2011 WL 5448251, at *4 (S.D.N.Y. Nov. 4, 2011) (quoting Thomas v. IStar Financial, Inc., 508 F. Supp. 2d 252, 257 (S.D.N.Y. 2007)). "Remittitur is appropriate to reduce verdicts only in cases 'in which a properly instructed jury hearing properly admitted evidence nevertheless makes an excessive award.'"  Webungs Und Commerz Union Austalt v. Collectors' Guilt, Ltd., 930 F.2d 1021, 1027 (2d Cir. 1991) (citing Shu-Tao Lin v. McDonnell Douglas Corp., 742 F.2d 45, 50 (2d Cir. 1984)).  "A remittitur, in effect, is a statement by the court that it is shocked by the jury's award of damages."  Ismail v. Cohen, 899 F.2d 183, 186 (2d Cir. 1990).

### B.   Compensatory Damage Award

Arguing that McMillan suffered no more than "garden-variety" emotional distress, the Hotel asserts that the jury's award of $125,000 in emotional distress damages is excessive and should be remitted to no more than $10,000.  (Def. Br. 16)

"'While it is properly within the province of the jury to calculate damages, there is "an upper limit, and whether that has been surpassed is not a question of fact with respect to which reasonable [persons] may differ, but a question of law."'"  Dotson v. City of Syracuse,

16

No. 5:04-CV-1388(NAM)(GJD), 2011 WL 817499, at *13 (N.D.N.Y. Mar. 2, 2011) (quoting

Khan v. Hip Centralized Lab. Servs., Inc., No. CV-03-2411(DGT), 2008 WL 4283348, at *6

(E.D.N.Y. Sept. 17, 2008) (citations omitted)).  "'[A] jury has broad discretion in measuring

damages, but it may not abandon analysis for sympathy for a suffering plaintiff and treat an

injury as thought it were a winning lottery ticket.'"  Id. (quoting Khan, 2008 WL 4283348, at

*6).  "Importantly, in calculating the remittitur, the court must use the 'least intrusive' – and

'most faithful to the jury's verdict' – method of 'reduc[ing] the verdict only to the maximum that

would be upheld by the trial court as not excessive.'"  Anderson Group, LLC v. City of

Syracuse, No. 1:05-cv-1368(GLS)(DRH), 2011 WL 2472996, at *8 (N.D.N.Y. June 21, 2011)

(quoting Earl v. Bouchard Transp. Co., Inc., 917 F.2d 1320, 1328-30 (2d Cir. 1990)).  To

determine whether an award is so high as to "shock the judicial conscience," the Court must

"'consider[ ] . . . the amounts awarded in other, comparable cases.'"  DiSorbo v. Hoy, 343 F.3d

172, 183 (2d Cir. 2003) (quoting Mathie v. Fries, 121 F.3d 808, 813 (2d Cir. 1997)).  A court

should determine whether the award is "within a reasonable range," not just "balance the number

of high and low awards and reject the verdict in the instant case if the number of lower awards is

greater."  Ismail, 899 F.2d at 187.

       A compensatory award for emotional distress in a discrimination action may be

based on testimonial evidence alone and "is not preconditioned on whether [the plaintiff]

underwent treatment, psychiatric or otherwise."  Jowers v. DME Interactive Holdings, Inc., No.

00 Civ. 4753(LTS)(KNF), 2006 WL 1408671, at *3, 12 (S.D.N.Y. May 22, 2006).  Damages for

emotional distress, however, cannot be assumed simply because discrimination has occurred.

See, e.g., Lopes v. Caffe Centrale LLC, 548 F. Supp. 2d 47, 55 (S.D.N.Y. 2008) ("[Plaintiff]

must prove his entitlement to compensatory damages.") (citing Fowler v. New York Transit

Auth., No. 96 Civ. 6796(JGK), 2001 WL 83228, at *10 (S.D.N.Y. Jan. 31, 2001)

("'[C]ompensatory damages must be proven and not presumed.'") (citation omitted)).

"Emotional distress awards within the Second Circuit can 'generally be grouped

into three categories of claims:  "garden-variety," "significant" and "egregious."'  In 'garden

variety' emotional distress claims, 'the evidence of mental suffering is generally limited to the

testimony of the plaintiff, who describes his or her injury in vague or conclusory terms, without

relating either the severity or consequences of the injury.'  Such claims typically 'lack[ ]

extraordinary circumstances' and are not supported by any medical corroboration."  Olsen v.

County of Nassau, 615 F. Supp. 2d 35, 46 (E.D.N.Y. 2009) (internal citations omitted).

"'Significant' emotional distress claims 'differ from the garden-variety claims in

that they are based on more substantial harm or more offensive conduct, are sometimes

supported by medical testimony and evidence, evidence of treatment by a healthcare professional

and/or medication, and testimony from other, corroborating witnesses.'"  Id. (quoting Khan,

2008 WL 4283348, at *11).  "Finally, 'egregious' emotional distress claims 'generally involve

either "outrageous or shocking" discriminatory conduct or a significant impact on the physical

health of the plaintiff.'"  Id. (quoting Khan, 2008 WL 4283348, at *12).  "In 'significant' or

'egregious' cases, where there is typically evidence of 'debilitating and permanent alterations in

lifestyle,' larger damage awards may be warranted."  Id. (citation omitted).

"Of course, a court is not required to remit a large non-economic damage award,

even where evidence of emotional damage consists solely of plaintiff's testimony."  Mendez v.

Starwood Hotels & Resorts Worldwide, Inc., 746 F. Supp. 2d 575, 601 (S.D.N.Y. 2010) (citing

Osorio v. Source Enterprises, Inc., No. 05 Civ. 10029(JSR), 2007 WL 683985 (S.D.N.Y. Mar. 2,

2007)).  "However, when a court is convinced that the jury's award is entirely out of proportion

to the plaintiff's injury, and was motivated by sympathy rather than by evidence of harm, remittitur is the appropriate remedy."   Id.

Here, Plaintiff offered very little evidence of emotional distress.  Indeed, McMillan himself did not offer any testimony concerning his emotional distress, testifying only that working for Scudero in the Engineering Department had been "horrible."  (Tr. 185)  There is no evidence that McMillan ever sought medical or psychological treatment, that he missed work, that he had any difficulty sleeping, that he lost his appetite, or that his alleged emotional distress had any physical manifestation or disrupted other aspects of his daily life.  He remained at work throughout the period of alleged discriminatory acts.

McMillan's daughter's testimony was only marginally more descriptive:  she testified that while working under Scudero, her father "was always sad" (Tr. 301), "wasn't as happy anymore" (Tr. 301), and "wasn't his same self."  (Tr. 302)  She stated that McMillan's temperament changed.  (Tr. 301)  Foster testified that "it was hard" for McMillan to work under Scudero (Tr. 154), and that he "watched [McMillan] constantly going through all the stress." (Tr. 156)

Such evidence, at best, demonstrates "garden variety" emotional distress.  To the very limited extent that McMillan described his injury, he did so in "vague or conclusory terms" without "relat[ing] either the severity or consequences of the injury."  His claims were likewise "not supported by any medical corroboration."  Olsen, 615 F. Supp. 2d at 46.

In the Second Circuit, "'[g]arden variety' emotional distress claims 'generally merit $30,000 to $125,000 awards.'"  Id.; see also Lore v. City of Syracuse, 670 F.3d 127, 177 (2d Cir. 2012) ("This Court has . . . affirmed awards of $125,000 each to plaintiffs for emotional distress resulting from age discrimination where the evidence of emotional distress consisted

only of 'testimony establishing shock, nightmares, sleeplessness, humiliation, and other subjective distress.'  . . . [W]e [have previously] rejected [a] defendant's contention that those damage awards, for 'garden variety emotional distress claims,' 'should have been reduced to between $5,000 and $30,000.'") (citations omitted); Patterson v. Balsamico, 440 F.3d 104, 120 (2d Cir. 2006) (upholding the jury's $100,000 compensatory damages award where "the plaintiff offered testimony of his humiliation, embarrassment, and loss of self-confidence, as well as testimony relating to his sleeplessness, headaches, [and] stomach pains"); Meacham v. Knolls Atomic Power Laboratory, 381 F.3d 56 (2d Cir. 2004) (upholding award of $125,000 for "subjective distress"), vacated on other grounds sub nom. KAPL, Inc. v. Meacham, 544 U.S. 957 (2005); DeCurtis v. Upward Bound Int'l, Inc., No. 09 Civ. 5378(RJS), 2011 WL 4549412, at *4 (S.D.N.Y. Sept. 27, 2011) ("A review of the relevant case law in this jurisdiction reveals that plaintiffs with garden-variety claims generally receive between $30,000 and $125,000."); Dotson, 2011 WL 817499, at *15 ("Where emotional distress encompasses humiliation, shame, shock, moodiness and being upset but is devoid of any medical treatment or physical manifestation, it is considered to be 'garden variety.'  'Garden variety' emotional distress claims generally merit $30,000 to $125,000 awards.").

Where a plaintiff offers only sparse evidence of emotional distress, however, courts have reduced such awards to as little as $10,000.  See, e.g., Mendez, 746 F. Supp. 2d at 601 (remitting jury's award of $1 million in compensatory damages for employer's act of retaliation – namely, installing a hidden camera above the employee's work station – to $10,000, where there was no evidence the employee suffered any significant damage because of the installation of the camera and where plaintiff "did not attribute depression, anxiety or any other indicium of non-economic damage to the presence of the camera"); Reiter v. Metro. Transp.

Auth. of New York, No. 01 Civ. 2762(JGK), 2003 WL 22271223 (S.D.N.Y. Sept. 30, 2003)

(reducing award from $140,000 to $10,000, where plaintiff was transferred to a job in a less

desirable department but retained the same salary); Fowler, 2001 WL 83228, at *13 (reducing

emotional distress award from $50,000 to $25,000, where the plaintiff "did not present any

evidence detailing the duration or magnitude of his emotional injuries, nor did he present

evidence of medical or psychological treatment"); Kim v. Dial Service Int'l, Inc., No. 96 Civ.

3327(DLC), 1997 WL 458783, at *13-14 (S.D.N.Y. Aug. 11, 1997) (reducing $300,000

emotional distress award to $25,000 "given the sparse evidence introduced at trial regarding the

plaintiff's mental anguish"); McIntosh v. Irving Trust Co., 887 F. Supp. 662 (S.D.N.Y. 1995)

(reducing $219,428 emotional distress award in discrimination action to $20,000).

      Given the conclusory nature of McMillan's and his daughter's testimony and the

lack of any supporting detail or specific examples of emotional injuries suffered by McMillan,

the Court finds that the evidence warrants only a modest award of emotional distress damages.

In surveying the case law in this Circuit, research has revealed no case in which an emotional

distress award of $125,000 has been sustained in a discrimination action on such limited

evidence.

      The cases cited by McMillan in support of the jury's award (Pltf. Opp. Br. 16-17)

are distinguishable.  For example, in Mugavero v. Arms Acres, Inc., 680 F. Supp. 2d 544

(S.D.N.Y. 2010), the plaintiff "testified that her emotional distress from being terminated had

specific consequences in the form of increased anxiety and insomnia . . . and provided

corroborating medical evidence." Id. at 578.  Moreover, this Court found that "the conduct . . .

went far beyond typical discipline imposed in the workplace, and threatened Plaintiff's ability to

earn a living and practice her profession." Id.  Accordingly, the Court determined that "[g]iven

that [plaintiff's former supervisor's] action was 'more offensive conduct' than is commonly seen in a 'garden-variety' case, neither the emotional distress award of $100,000 for Mugavero's termination nor the total emotional distress award of $175,000 [representing emotional distress damages of $100,000 for her termination and $75,000 for the supervisor's bad faith request to the Office of Professional Discipline to investigate plaintiff] shocks the conscience or is excessive."  Id.

Similarly, in Patterson – in which the Second Circuit held that the district court did not abuse its discretion in declining to grant a remittitur of a $100,000 emotional distress award – the plaintiff "offered testimony of his humiliation, embarrassment, and loss of self-confidence, as well as testimony relating to his sleeplessness, headaches, [and] stomach pains . . . ."  440 F.3d at 120.  Likewise, in Olsen, the plaintiffs offered specific evidence of emotional injuries.  For example, one plaintiff testified that the discrimination she suffered caused her to become "very 'stressed' and 'anxious' about what would happen next at work . . . which carried over into her personal life.  [The plaintiff testified that she] began to have less patience for her husband and her children and would arrive home from work 'very annoyed' and 'aggravated.'" 615 F. Supp. 2d at 47.  Another plaintiff testified that she had experienced physical manifestations of her emotional distress, including "'pains running down her arm' as well as 'pains in her chest,' fatigue and sleeplessness that caused her to consult her physician out of fear that she was suffering a heart attack."   Id.

The evidence in these cases is not comparable to what was offered here. McMillan "did not present either the quality or quantity of evidence" necessary to support a $125,000 award.  Kim, 1997 WL 458783, at *14.  Given the absence of substantial evidence of

emotional distress, the Court finds that an award of $30,000 constitutes "'the maximum that [can] be upheld . . . as not excessive.'" Anderson, 2011 WL 2472996, at *8.

Accordingly, the Hotel's motion for a new trial concerning compensatory damages will be granted unless McMillan agrees to a remittitur reducing the compensatory damage award from $125,000 to $30,000.

### C.    Punitive Damage Award

The Hotel argues that the Court must vacate or remit the jury's $1 million punitive damage award because (1) the evidence was insufficient to justify punitive damages, and (2) the award is, in any event, constitutionally excessive.  (Def. Br. 19-23)

### 1.    Standard for Punitive Damages

Punitive damages are available under both federal law and the NYCHRL.  Farias v. Instructional Sys., Inc., 259 F.3d 91, 101 (2d Cir. 2001) (citing 42 U.S.C. § 1981a(b)(1); N.Y. City Admin. Code § 8-502(a)).  A plaintiff is not entitled to punitive damages under Title VII unless the employer "'engaged in intentional discrimination . . . "with malice or with reckless indifference to the federally protected rights of an aggrieved individual."'"  Zimmermann v. Assoc. First Capital Corp., 251 F.3d 376, 384 (2d Cir. 2001) (quoting Kolstad v. Am. Dental Ass'n, 527 U.S. 526, 529-30 (1999)).  A "'positive element of conscious wrongdoing'" is required.  Kolstad, 527 U.S. at 529-30 (1999) (quoting 42 U.S.C. § 1981a(b)(1)).  "Direct evidence that an employer acted with knowledge that the discrimination . . . violated federal law is not required; rather, the requisite state of mind may be inferred from the circumstances."  Manzo v. Sovereign Motor Cars, Ltd., No. 08-CV-1229(JG)(SMG), 2010 WL 1930237, at *2 (E.D.N.Y. May 11, 2010) (citing Zimmerman, 251 F.3d at 385 (general training in equal opportunity protocol and hiring practices is sufficient to infer awareness of Title VII

23

requirements); Hill v. Airborne Freight Corp., 212 F. Supp. 2d 59, 76 (E.D.N.Y. 2002)

("Arguably, it was reasonable for the jury to infer that [defendant's] managers knew that their

actions were in violation of federal law simply by virtue of the well-established Supreme Court

case law on discrimination and retaliation, the long[-]standing schemes proscribing such

conduct, the size of [defendant's company], and the common knowledge in today's society that

employment discrimination is impermissible.")).   "'As an alternative to proving that the

defendant knew it was acting in violation of federal law, "[e]gregious or outrageous acts may

serve as evidence supporting an inference of the requisite evil motive."'" Hill, 212 F. Supp. 2d

at 75 (quoting Kolstad, 527 U.S. at 538).

> The NYCHRL "'does not provide a standard to use in assessing whether
[punitive] damages are warranted.'" Farias, 259 F.3d at 101.  Accordingly, the Second Circuit
has determined that "the federal standard applies to claims for punitive damages under the
[NYCHRL]." Id.

> The jury was properly instructed in accordance with this standard, and the Hotel
does not challenge the Court's charge.  Instead, the Hotel argues that the evidence was
insufficient to support any punitive damage award.  In the alternative, the Hotel argues that the
award is excessive.

> The Court will not disturb the jury's determination that punitive damages were
warranted in this action.  Given McMillan's objection to the dolls, the inflammatory nature of the
voodoo doll display, and the Hotel's failure to impose any disciplinary sanction in connection
with this incident, a rational jury could find that the Hotel acted with reckless indifference to
McMillan's protected rights.  See Cruz v. Henry Modell & Co., Inc., No. CV 05-1450(AKT),
2008 WL 905356, at *9 (E.D.N.Y. Mar. 31, 2008) ("Punitive damages have been awarded in a

variety of discrimination cases based on the general reprehensible nature of the discriminatory conduct."); Colbert v. Furumoto Realty, Inc., 144 F. Supp. 2d 251, 258 (S.D.N.Y. 2001) ("We fail to see how racial discrimination is not sufficiently reprehensible to warrant a punitive damages award.").  Moreover, at the time of the voodoo doll incident, the Hotel had a policy against racial discrimination in place, which was distributed during new employee orientation and posted on bulletin boards within the Hotel, such that a rational jury could infer from these circumstances that Scudero knew that his actions violated McMillan's rights.  (Tr. 84-85)  See Zimmerman, 251 F.3d at 385 (general training in equal opportunity protocol and hiring practices is sufficient to infer awareness of Title VII requirements); see also Hill, 212 F. Supp. 2d at 76.

### 2. Excessiveness Inquiry

"Regarding the magnitude of punitive damage awards, due process requires that they be '"reasonable in their amount and rational in light of their purpose to punish what has occurred and to deter its repetition."'"[11] Hill, 212 F. Supp. 2d at 75 (quoting Vasbinder v. Scott, 976 F.2d 118, 121 (2d Cir. 1992) (quoting Pacific Mut. Life Ins. Co. v. Haslip, 499 U.S. 1, 21 (1991))).  In determining whether a punitive damage award is excessive, courts must consider the "guideposts" cited by the Supreme Court in BMW of North Am., Inc. v. Gore, 517 U.S. 559 (1996), including "(1) the degree of reprehensibility of the tortious conduct, (2) the ratio of punitive damages to compensatory damages, and (3) the difference between this remedy and the civil penalties authorized or imposed in comparable cases."[12] Lee v. Edwards, 101 F.3d 805, 809 (2d Cir. 1996) (citing Gore, 517 U.S. at 575).

---

[11]  No evidence was offered at trial concerning Defendant's net worth or assets.

[12]  Although Title VII sets caps on compensatory and punitive damage awards, the NYCHRL contains no such restrictions.  See Holness v. Nat'l Mobile Television, Inc., No. 09 CV 2601(KAM)(RML), 2012 WL 1744847, at *6 n.14 (citing 42 U.S.C. § 1981a(b)(3)(A)-(D)); see also Quinby v. WestLB AG, No. 04 Civ. 7406(WHP), 2008 WL 3826695, at *5 (S.D.N.Y. Aug.

The Supreme Court has noted that "[p]erhaps the most important indicium of the reasonableness of a punitive damages award is the degree of reprehensibility of the defendant's conduct." Gore, 517 U.S. at 575.  Courts determine the reprehensibility of a defendant's conduct by considering whether

> the harm caused was physical as opposed to economic; the tortious conduct evinced an indifference to or a reckless disregard of the health or safety of others; the target of the conduct had financial vulnerability; the conduct involved repeated actions or was an isolated incident; and the harm was the result of intentional malice, trickery, or deceit, or mere accident.

State Farm Mut. Auto. Ins. Co. v. Campbell, 538 U.S. 408, 419 (2003) (citation omitted); see also Gore, 517 U.S. at 576 ("'nonviolent crimes are less serious than crimes marked by violence or the threat of violence.'  Similarly, 'trickery and deceit' are more reprehensible than negligence.") (citations omitted); Norris v. New York City Coll. of Tech., No. 07-CV-853, 2009 WL 82556, at *7 (E.D.N.Y. Jan. 14, 2009) ("Factors bearing on the degree of reprehensibility include '(1) whether a defendant's conduct was violent or presented a threat of violence, (2) whether a defendant acted with deceit or malice as opposed to acting with mere negligence, and (3) whether a defendant has engaged in repeated instances of misconduct.'") (quoting Lee, 101 F.3d at 809 (citing Gore, 517 U.S. at 575-77)).  "The existence of any one of these factors weighing in favor of a plaintiff may not be sufficient to sustain a punitive damages award; and the absence of all of them renders any award suspect." State Farm, 538 U.S. at 419.  "[P]unitive damages 'should reflect the enormity of [a defendant's] offense.'" Lee, 101 F.3d at 809 (quoting Gore, 517 U.S. at 575).

With respect to the ratio of punitive damages to compensatory damages, the Supreme Court has "been reluctant to identify concrete constitutional limits on the ratio between

---

15, 2008) ("While the New York City Administrative Code allows Plaintiff to recover punitive damages in excess of $300,000 . . . Title VII caps them at $300,000.").

harm, or potential harm, to the plaintiff and the punitive damages award." State Farm, 538 U.S. at 424 (citations omitted).  However, the Court has noted that "[o]ur jurisprudence and the principles it has now established demonstrate . . . that, in practice, few awards exceeding a single-digit ratio between punitive and compensatory damages, to a significant degree, will satisfy due process." Id. at 425.

Even when the "punitive award is not beyond the outer constitutional limit marked out . . . by the Gore guideposts," a court must separately determine whether the award is "so high as to shock the judicial conscience and constitute a denial of justice." Mathie, 121 F.3d at 816-17.  In determining whether a punitive damages award is excessive, a court must "keep in mind the purpose of punitive damages:  'to punish the defendant and to deter him and others from similar conduct in the future.'" Lee, 101 F.3d at 809 (2d Cir. 1996) (citation omitted).  The Second Circuit has instructed that the excessiveness inquiry for punitive damages, as for compensatory damages, "requires comparison with awards approved in similar cases." Mathie, 121 F.3d at 817.  Lower courts have noted, however, that "comparing punitive damage awards in other cases where employers were found liable for discrimination . . . is of limited utility because a wide range of awards have been upheld." Hill, 212 F. Supp. 2d at 76-77 (collecting cases upholding awards ranging from $10,000 to $1.25 million).  "[T]here has been an extraordinarily wide range of recent punitive damages awards in this circuit [in discrimination cases], from $300 to over $1 million." Holness, 2012 WL 1744847, at *6 (citations omitted).

With respect to the reprehensibility of its actions, the Hotel argues that "there was no evidence demonstrating racially motivated intent, let alone deceit, malice, or threat of violence or repeated instances of such misconduct.  There was no evidence of any hatred, ill will, or evil discriminatory intent by any of Mr. McMillan's coworkers or supervisors."  (Def. Br. 20)

27

McMillan counters that "the hanging of a black-faced voodoo doll by its neck arguably threatened violence – particularly where Engineering Supervisor Paray told Mr. McMillan that the doll was him knowing that Mr. McMillan was deeply troubled by the doll."  (Pltf. Opp. Br. 18)  McMillan also contends that "the fact that neither Mr. Scudero nor Mr. Fariello removed the doll when Mr. McMillan indicated to Mr. Scudero that he was offended, and where Mr. Paray had specifically told Mr. Fariello that people were offended, can be seen as malice rather than mere negligence."  (Id.)  McMillan also argues that the Hotel engaged in a "pattern of misconduct" spanning more than two years, and that McMillan had financial vulnerability.  (Id.)

Crediting the jury's verdict, the evidence supports the conclusion that the Hotel's managers were at least more than merely negligent, and that they acted with knowledge that their conduct would violate McMillan's rights.  Moreover, because the jury was permitted to consider two incidents – the voodoo doll incident and the 2009 Sierra incident – in determining damages, the Hotel's misconduct could be viewed as "repeated."  Nevertheless, "[i]t is clear that [the Hotel's] conduct did not result in physical injury to [McMillan], nor did it evince an indifference to or reckless disregard for the health or safety of others."  Thomas, 652 F.3d at 148.  Moreover, McMillan did not establish a "pattern of discrimination" that extended to other employees in his protected group.  Greenbaum v. Handelsbanken, 67 F. Supp. 2d 228, 269-70 (S.D.N.Y. 1999).

There was likewise no evidence of retaliation against McMillan for complaining of discrimination, nor is there any evidence of trickery or deceit.  Moreover, the Hotel conducted extremely thorough investigations of both the voodoo doll incident and the Sierra incident.  As soon as Pyne was made aware of the voodoo doll hanging from the bulletin board, it was taken down.  (Tr. 134)  In addition, as discussed above, the evidence of McMillan's emotional distress was sparse at best.

The Court finds that "[t]he defendant's conduct, while meriting some award of punitive damages, was by no means as reprehensible as that in many other [employment] discrimination . . . cases." Iannone, 941 F. Supp. at 414.  Cases upholding punitive damage awards of $200,000 or more generally involve discriminatory or retaliatory termination resulting in severe financial vulnerability to plaintiff, repeated incidents of misconduct over a significant period of time, repeated failures to address complaints of discrimination, and/or deceit.  See, e.g., Manzo, 2010 WL 1930237, at *5 (upholding $200,000 punitive damage award where "there was evidence that [plaintiff] suffered significant psychological and emotional distress as a direct result of [her supervisor's] sexually harassing behavior. . . . There was also ample evidence that [plaintiff] was in a precarious financial situation during the period of harassment, that [her supervisor] knew about that situation, and that he used it to his advantage in exerting his power over her.  [The supervisor's] harassment of [plaintiff] was not an isolated incident, but rather it began shortly after the start of her employment and continued largely unabated until her termination.  Finally, as the jury concluded in awarding punitive damages, [the supervisor's] harassment of [plaintiff], and [the] retaliatory termination, were not mere accidents.  [The supervisor] intentionally manipulated the terms and conditions of [plaintiff's] employment both to pursue his goal of a romantic relationship with her and to penalize her when she spurned his advances."); Kauffman v. Maxim Healthcare Servs., Inc., 509 F. Supp. 2d 210 (E.D.N.Y. 2007) (remitting a $1.5 million punitive damage award to just over $500,000, where the court found that "[t]here is evidence in the record from which the jury could have concluded that the degree of reprehensibility of Defendant's conduct was substantial.  Plaintiff endured sexist and racist remarks throughout his tenure with Defendant.  He was pressured by Defendant to engage in illegal acts to perpetuate discriminatory employment practices designed to maintain Defendant as

a 'white-male-driven' company.  He was berated, intimidated, and threatened by Defendant's

executives when he refused to accede to their unlawful demands upon him and punished for such

refusal by being transferred to the distant New Haven office, and ultimately, by being

terminated.  He was also summarily ejected from his office while being cursed at by [his regional

account manager] for his refusal to discriminate. . . . Defendant deprived Plaintiff of his

livelihood and inflicted economic harm upon a financially vulnerable target" and "Defendant's

conduct also involved repeated actions of misconduct with respect to other employees.");

Watson v. E.S. Sutton, Inc., No. 02 Civ. 27399(KMW), 2005 WL 2170659 (S.D.N.Y. Sept. 6,

2005) (remitting a $2.5 million punitive damage award to $717,000 where defendant repeatedly

failed to address complaints of sexual misconduct, maliciously terminated plaintiff for

complaining of sexual harassment leaving her with no income, filed false affidavits in response

to her EEOC charge, and falsely accused her of committing a federal crime).

       The cases cited by McMillan in support of the $1 million punitive damage award

here (Pltf. Opp. Br. 18-19) involve more reprehensible conduct.  See, e.g., Greenbaum, 67 F.

Supp. 2d at 269-70 (upholding $1.25 million punitive damage award where "the jury could have

inferred from some of [the deputy general manager's] comments and other comments made by

high-level [general managers] that [defendant] was not only negligent regarding [plaintiff's]

federally protected rights but was acting with malice.  Moreover, 'repeated misconduct is more

reprehensible than an individual instance of malfeasance,' and the jury found that [plaintiff] was

subjected to a six-year pattern of discrimination, which ended in a retaliatory attack when she

finally complained of the misconduct.  Other evidence suggests that [defendant] officials

deceitfully hid their adverse actions from [plaintiff] over this period, and tried to retaliate against

her in a deceitful manner by moving her to a position that would later be phased out for

seemingly extrinsic reasons.  The record also suggests that this pattern of discrimination may have extended to other female employees or potential employees as well."); Goldsmith v. Bagby Elevator Co., Inc., 513 F.3d 1261, 1283 (11th Cir. 2008) ("We conclude that the conduct of [defendant] was sufficiently reprehensible to support an award of punitive damages because the harm suffered by [plaintiff] was not purely economic, [plaintiff] was financially vulnerable, and the racially offensive comments and conduct were not isolated. . . . [Plaintiff's] relationships with his family suffered, he attended counseling after his termination . . . [and] the record also establishes that [plaintiff] was financially vulnerable and had to borrow money after he was terminated.  Another factor that suggests that the misconduct of [defendant] was reprehensible is that [defendant] engaged in a pattern of retaliatory and discriminatory misconduct.  Three other employees who had filed EEOC charges or complained about racial slurs were terminated before [plaintiff].  There was also substantial evidence . . . that [defendant] engaged in a pattern of reckless indifference to its employees' federal rights.").

"[T]aking all of the circumstances of the case into account, [the Hotel's] conduct . . . was insufficiently reprehensible to justify a punitive damages award in significant excess of his compensatory damages award."  Thomas, 652 F.3d at 149.

With respect to the ratio factor, the jury's award of $1 million in punitive damages and $125,000 in emotional distress damages represents a ratio of 8 to 1.  Taking into account this Court's remittitur of the compensatory damage award, the ratio rises to approximately 33 to 1.  See DiSorbo, 343 F.3d at 187 ("if we assume that [plaintiff] remits to yield a $250,000 compensatory damages award for the excessive force claim, the ratio between compensatory and punitive damages would be 2.5-to-1"); Mendez, 746 F. Supp. 2d at 603 ("The ratio between the remitted [compensatory damage] award of $10,000 and $3 million – 300:1 – is

31

so far out of proportion as to make the award of punitive damages unconstitutionally excessive."); Quinby, 2008 WL 3826695, at *5 n.1 ("Because the Court remits compensatory damages to $300,000, the ratio is now 4.3 to 1.").   "The Supreme Court has 'concluded that [a punitive damages] award of more than four times the amount of compensatory damages might be close to the line of constitutional impropriety.'"  Thomas, 652 F.3d at 149 (discussing a 5.7 to 1 ratio after taking into account the court's remittitur of the compensatory damage award) (quoting State Farm, 538 U.S. at 425).  As noted above, the Supreme Court has stated that "few awards exceeding a single-digit ratio between punitive and compensatory damages, to a significant degree, will satisfy due process."  State Farm, 538 U.S. at 425.  Accordingly, this factor weighs in favor of significantly reducing the punitive damages award.

Finally, the Court must compare the punitive damage award to applicable civil penalties.  Lee, 101 F.3d at 809.  Here, the civil penalty for violating the NYCHRL – a maximum of $250,000 for an "unlawful discriminatory practice [that] was the result of the respondent's willful, wanton or malicious act" – counsels in favor of reduction.  N.Y.C. Admin. Code § 8-126(a); see also Thomas, 652 F.3d at 149; Norris, 2009 WL 82556, at *7.  Similarly, under federal law, compensatory and punitive damages are capped at $300,000 in total.  42 U.S.C. § 1981a(b)(3)(D); see also Iannone, 941 F. Supp. at 415 ("[Defendant] employs more than five hundred employees, and combined compensatory and punitive damages therefore may not exceed $300,000.").

A survey of punitive damage awards in discrimination and retaliation cases reveals that the $1 million award here is excessive and should be reduced significantly.  See, e.g., Chisholm, 2011 WL 5448251, at *1 (remitting punitive damage award from $1 million to $50,000, finding that "an award of $50,000 is more in line with the punitive damages awarded in

32

similar cases by this Court and other courts in this Circuit"); DeCurtis, 2011 WL 4549412, at *5
(awarding $75,000 in punitive damages on plaintiff's sex discrimination and retaliation claims,
noting that "[c]ourts in this Circuit have consistently favored lower awards in circumstances
comparable to those here"); Norris, 2009 WL 82556, at *7 (remitting jury's $425,000 punitive
damage award to $25,000; noting that "[w]hile the evidence supports the conclusion that
[plaintiff's supervisor] acted intentionally and with knowledge that his conduct would violate
[plaintiff's] rights, no other indicia of reprehensibility are present.  There was no violence or
threat of violence.  Nor was there any evidence of repeated misconduct . . . . Even taking the
evidence in the light most favorable to Norris, the Court is left with the firm conviction that [the
supervisor's] decision to terminate her after learning of her complaint of discrimination was a
transient outburst of pique and frustration; while such conduct warrants some amount of
punishment and deterrence, it is not sufficiently reprehensible to support the jury's award of
$425,000."); Parrish v. Sollecito, 280 F. Supp. 2d 146, 164 (S.D.N.Y. 2003) (reducing punitive
damages from $500,000 to $50,000 where the plaintiff suffered a "low degree of actual harm,"
the award was 33 times the compensatory damages award, and the court was also awarding
attorneys' fees); Lamberson v. Six W. Retail Acquisition, Inc., No. 998 Civ. 8053, 2002 WL
59424, at *6-7 (S.D.N.Y. Jan. 16, 2002) (remitting punitive damage award in Title VII retaliation
case from $375,000 to $30,000 where the ratio between punitive and compensatory damages was
almost 27 to 1, there was no evidence of violence, deceit or malice, and no history of
misconduct); Fernandez v. North Shore Orthopedic Surgery & Sports Med., P.C., 79 F. Supp. 2d
197, 208 (E.D.N.Y. 2000) (concluding that "the maximum award of punitive damages that would
not be excessive is $50,000" after finding a low degree of reprehensibility and noting that "[i]n
comparison with other civil penalties for similar conduct, the punitive damages award [of

$100,000] in this case appears excessive"); Kim, 1997 WL 458783, at *14-15 (remitting $725,000 punitive damage award to $25,000 where degree of reprehensibility associated with race discrimination claim was low because "there was no violence and very little repetition of the misconduct").

The Court concludes that a punitive damage award of no more than $100,000 is proper in this case. Such an award is nearly four times the remitted compensatory damages amount, a ratio which "[t]he Supreme Court has 'concluded . . . might be close to the line of constitutional impropriety.'" Thomas, 652 F.3d at 149 (quoting State Farm, 538 U.S. at 425). If McMillan does not accept a remittitur to that amount, the Court will vacate the punitive damage award and conduct a new trial limited to the question of damages. See Kauffman, 509 F. Supp. 2d 221 (citing Vasbinder, 976 F.2d at 122).

## CONCLUSION

For the reasons stated above, Defendant's motion for judgment as a matter of law is denied. Defendant's motion for a new trial is granted on the issue of damages unless Plaintiff agrees in writing by June 18, 2012, to a remittitur reducing the compensatory damage award to $30,000 and the punitive damage award to $100,000. The Clerk of Court is directed to terminate the motion. (Dkt. No. 66)

Dated: New York, New York
       June 11, 2012

SO ORDERED.

Paul G. Gardephe
United States District Judge

34